UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NIESJE GOFFE,

              Plaintiff,

  – against –

NYU HOSPITAL CENTER, PETER
VARGAS, JASMINE CABRERA, JESSICA
LUGO, and MELISSA DELACASTILLO,

              Defendants.

**MEMORANDUM & ORDER**

14-CV-4988

**PARTIES**

Niesje Goffe

NYU Hospital Center
Peter Vargas
Jasmine Cabrera
Jessica Lugo
Melissa Delcastillo

**APPEARANCES**

Gregory R. Preston
Preston & Wilkins, PLLC
3000 Hempstead Tpke
Suite 317
Levittown, NY 11756
212-809-5808
gpreston@pwlawllc.com

Richard L. Steer
Jonathan Samuel Hershberg
Tara Toevs Carolan
Maxwell David Rosenthal
Tarter Krinsky & Drogin LLP
1350 Broadway, 11th Floor
New York, NY 10018
212-216-8000
rsteer@tarterkrinsky.com
jhershberg@tarterkrinsky.com
ttoevs@tarterkrinsky.com
mrosenthal@tarterkrinsky.com

**JACK B. WEINSTEIN, Senior United States District Judge**:

## Table of Contents

I. Introduction ........................................................................................................... 3

II. Facts ..................................................................................................................... 3

    A. Defendants ..................................................................................................... 3

    B. Plaintiff's tenure at NYUHC ......................................................................... 4

    C. Alleged Discrimination ................................................................................. 11

    D. EEOC Charge ............................................................................................... 13

    E. The Instant Action ........................................................................................ 14

III. Law ..................................................................................................................... 14

    A. Summary Judgment Standard ...................................................................... 14

    B. Title VII and New York State Human Rights Law ...................................... 15

        1. Disparate Treatment ................................................................................ 15

        2. Hostile Work Environment ..................................................................... 17

        3. Retaliation ............................................................................................... 19

    C. 42 U.S.C. § 1981 .......................................................................................... 20

    D. New York City Human Rights Law .............................................................. 21

IV. Application of Law to Facts ................................................................................ 23

    A. Statute of Limitations ................................................................................... 23

    B. Disparate Treatment by NYUHC ................................................................. 24

        1. Prima Facie Case ..................................................................................... 24

        2. Non-Discriminatory Explanation ........................................................... 26

        3. Pretext ..................................................................................................... 26

    C. Hostile Work Environment by NYUHC ...................................................... 28

    D. Retaliation by NYUHC ................................................................................ 33

    E. New York City Human Rights Law .............................................................. 35

    F. Section 1981 by Individual Defendants ........................................................ 37

V. Conclusion ........................................................................................................... 38

## I.  Introduction

This is an employment discrimination case.  It has some interest since it deals with differences in training and discipline provided to different ethnic groups by their employers.

Plaintiff worked as a clerk in the outpatient laboratory at NYU Hospital Center ("NYUHC").  She alleges that based on her race she suffered discrimination at the hands of her Hispanic supervisors.  She brings claims against the hospital and her individual supervisors and colleagues for disparate treatment, hostile work environment, and retaliation under Title VII and the New York Human Rights Law, and violations of the New York City Human Rights Law.  She seeks at least $2,500,000 in damages for emotional distress, and attorneys' fees.

Defendants NYUHC, Peter Vargas, Jasmine Cabrera, Jessica Lugo, and Melissa Delcastillo ("Defendants") have moved for summary judgment.  Defendants' motion is granted in part and denied in part.

## II.  Facts

### A.  Defendants

NYUHC is a hospital located in Manhattan.  Pl.'s Resp. to Defs.' Local Civ. R. 56.1 Statement of Undisputed Material Facts, May 24, 2016, ECF No. 43 ("56.1 Response"), at ¶ 1.  NYUHC has adopted a policy against workplace harassment and discrimination, and distributes statements of that policy to all new employees.  NYUHC directs employees to make any complaint of workplace harassment or discrimination either to the Employee Relations Department or to a member of NYUHC's senior management team.  *Id.* at ¶ 97.

Non-party Angela Pratt, an African-American female who was the administrative director of the outpatient laboratory, hired defendant Peter Vargas in 2004 as the Customer Service Supervisor.  *Id.* at ¶¶ 2, 6.  Vargas is of Italian and Puerto Rican heritage.  *Id.* at ¶ 11.  Ms. Pratt also hired defendants Jasmine Cabrera, Jessica Lugo, and non-party Edison Veras.  *Id.* at ¶¶ 3-4.

In 2009, Vargas was promoted to Administrative Director of the outpatient laboratory. *Id.* at ¶ 7. At some point after his promotion, Vargas hired defendant Melissa DelCastillo. Decl. of Gregory R. Preston, May 20, 2016, ECF No. 46 ("Preston Decl."), at Ex. 24 (Oct. 26, 2015 Dep. Tr. of Peter Vargas), at 34:12-18. Cabrera, Lugo, and DelCastillo are Hispanic. 56.1 Response at ¶ 10. Mr. Veras had been hired prior to plaintiff's employment in the outpatient laboratory; he left before she was hired, but returned after she began working there. *Id.* at ¶¶ 4-5.

As the Administrative Director, Vargas oversaw the outpatient laboratory, which was divided into three departments: customer service, phlebotomy, and clerical. *Id.* at ¶ 8. During plaintiff's employment, there were five supervisors working under Vargas: DelCastillo in customer service; Theresa Tyler and Tony Arceo in phlebotomy; and Lugo and Cabrera in clerical. *Id.* at ¶ 9.

### B. Plaintiff's tenure at NYUHC

Plaintiff was hired by NYUHC on April 19, 2010 through a job security fund pursuant to a collective bargaining agreement between the League of Voluntary Hospitals and Homes of New York and 1199SEIU United Healthcare Workers East. *Id.* at ¶¶ 15-16, 19. Although Vargas wanted to hire another candidate, it was his understanding that he was required to hire plaintiff pursuant to the terms of the collective bargaining agreement. *Id.* at ¶ 18; Preston Decl. at Ex. 1 (E-mail chain between Peter Vargas and Maria Felipe).

As part of her training, for roughly two-and-a-half hours each afternoon, plaintiff sat with the employees in the outpatient laboratory's "processing area," "observ[ing] and tak[ing] notes." 56.1 Response at ¶ 25. Plaintiff would also observe the people who were already in the area processing samples, and take notes. *Id.* at ¶ 28. DelCastillo sat with plaintiff once briefly, for no more than 15 minutes, while plaintiff was registering patients. During this observation plaintiff deleted all of the patient demographics and had to start over again. *Id.* at ¶ 94.

A "Test on Policy and Procedures," dated May 12, 2010, indicates that plaintiff scored an unsatisfactory 38 out of 100. Decl. of Jasmine Cabrera in Supp. of Defs.' Mot. for Summ. J., Mar. 25, 2016, ECF No. 36 ("Cabrera Decl."), at Ex. A. An "Employee Exam on Policy & Procedures in the Outpatient Lab," dated May 21, 2010, reflects that plaintiff scored 56.5%. Decl. of Peter Vargas in Supp. of Defs.' Mot. for Summ. J., Apr. 7, 2016, ECF No. 40 ("Vargas Decl."), at Ex. D.

An "Initial Competency Assessment," dated May 27, 2010, indicates that plaintiff performed unsatisfactorily in many of her duties and was "unable to meet the minimum requirements of a General Clerk." Cabrera Decl. at Ex. B. That same day plaintiff was terminated by Vargas due to substandard performance. Vargas Decl. at Ex. E; 56.1 Response at ¶¶ 35-36.

According to the termination memorandum given to plaintiff, her termination was based on her making the following errors:

- 17 orders placed missing required signatures and identification of samples received;

- 12 orders placed without the required patient identification numbers;

- 1 order placed on an incorrect patient;

- 2 orders placed with incorrect patient demographics;

- 3 missing required tests;

- 4 incorrect tests ordered; and

- 1 missing copy to physician;

Vargas Decl. at Ex. E.

Because plaintiff's probationary period had been inadvertently miscalculated and had passed, NYUHC was forced to reinstate plaintiff's employment.  56.1 Response at ¶ 43.  Plaintiff was reinstated on June 1 or 2, 2010, with full back pay.  *Id.* at ¶ 44.

On June 4, 2010, plaintiff was placed on a performance improvement plan as a result of her continuing to "make significant errors that are a potential compromise of Patient Care."  Vargas Decl. at Ex. F.  As part of the plan, plaintiff was provided with a "Competency Assessment for Re-Training Weekly Meeting Calendar."  The purpose of the calendar was to create specific timeframes to discuss the previous weeks' progress, to provide her with an opportunity to review all the events of the previous weeks associated with her re-training, and to discuss any questions or concerns she had with Vargas.  *Id.* at Ex. G; 56.1 Response at ¶ 48.  Entries on the calendar showed significant improvement; plaintiff completed the performance improvement plan by July 1, 2010.  Vargas Decl. at Ex. G.

On June 30, 2010, plaintiff completed an "Employee Exam on Policy & Procedures in the Outpatient Lab."  She scored a satisfactory 89%.  *Id.* at Ex. I.

On July 1, 2010, a "Competency Assessment for Re-Training," indicating the areas in which plaintiff was to be assessed, was signed by Vargas.  The document indicated that plaintiff would be assessed in the following areas: proper verification of patient demographics, proper verification of tests ordered and special information, order entry procedure in Netlims, ordering Misc tests in Netlims, answering the telephone in Customer Service, performing add-ons, and looking up specimen requirements.  *Id.* at Ex. H.  Plaintiff signed the document.  *Id.*; 56.1 Response at ¶ 51.

On September 15, 2010, plaintiff had a "Verbal Conference" with Cabrera regarding eleven errors plaintiff had made; the documents memorializing the conference do not indicate the

period in which the errors were made.  According to the conference record, plaintiff had six errors for missed tests, two errors for an incorrect test, one error for a missing comment, one error for a missing source, and one error for a carbon copy.  Cabrera Decl. at Exs. C-D.  Plaintiff disputes whether the errors she was accused of making were actually errors or were her fault. *See* Decl. of Niesje Goffe, May 24, 2016, ECF No. 48 ("Goffe Decl."), at ¶¶ 17-21, Exs. 7-8.

On October 1, 2010, plaintiff had a "Verbal Conference" with Lugo regarding eight errors plaintiff had made in September.  According to the documentation of the conference, plaintiff had one incorrect label, one incorrect test, and six missed tests.  Decl. of Jessica Lugo in Supp. of Defs.' Mot. for Summ. J., Apr. 6, 2016, ECF No. 38 ("Lugo Decl."), at Ex. A (Oct. 1, 2010 Verbal Conference).  Plaintiff disputes whether the errors she was accused of making were actually errors or were her fault.  *See* Goffe Decl. at ¶ 22, Ex. 9.

On October 28, 2010, Vargas met with plaintiff and her union delegate to discuss multiple issues.  Vargas Decl. at Ex. J.  The first issue was plaintiff's excessive absenteeism.  *Id.*; 56.1 Response at ¶ 60.  Plaintiff was issued a "Verbal Warning – Substandard Attendance" dated October 28, 2010, in which she was reminded that "attendance is an essential component of [her] overall job performance and Hospital Policy."  According to the memorandum, plaintiff called out sick nine times between July 20, 2010 and October 28, 2010.  Vargas Decl. at Ex. K (Oct. 28, 2010 Memorandum).  Plaintiff was warned that excessive absenteeism prevents her from "satisfactorily meeting the obligations of [her] job" and "places a heavy burden on [her] fellow employees and causes operational difficulties for [the] department."  The warning further advised plaintiff that her "failure to show immediate improvement in [her] attendance record will lead to further disciplinary action up to and including termination."  *Id.*

The second issue discussed at the October 28 meeting concerned the investigation of the vandalism of plaintiff's laboratory coat. At some point her coat was splashed with some kind of hazardous material. Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., May 24, 2016, ECF No. 44 ("Opp'n Mem."), at 9. Although plaintiff argues in her opposition brief that nothing was done about this incident, she admits that the incident was investigated by the NYU Medical Center Security Department. 56.1 Response at ¶ 90. When Security investigated, they asked whether plaintiff was the one who damaged her own laboratory coat. *Id.* at ¶ 91. Plaintiff told security that she thought it was Cabrera who damaged her belongings because she had made a complaint to her delegate alleging that Cabrera had not secured plaintiff's medical records. *Id.* at ¶ 92. Tony Arceo told Cabrera that she needed to secure plaintiff's documents, and Vargas agreed that the documents should not be left out in the open. *Id.* at 93. According to a memorandum to file dated October 28, 2010, plaintiff was told that the investigation was ongoing and a decision about reimbursement for damage to her shoes would be made once the investigation was complete. Vargas Decl. at Ex. J.

The third issue discussed was the "documentation of errors." The memorandum to file notes that plaintiff was told, "if a problem arises with a specimen and the physician's office cannot be contacted the proper documentation of actions in the problem log is sufficient. There is no need to write 'This is not my error!'" *Id.*

The fourth issue discussed concerned an incident that had occurred the previous day with a supervisor. The memorandum to file indicates that statements were taken from the involved parties. *Id.* This might refer to plaintiff's complaint that Melissa DelCastillo hit plaintiff on the back of the head and, after being asked to stop, purportedly laughed at plaintiff. Plaintiff reported the incident to her union delegate. This information is recounted in an e-mail from

plaintiff to the EEOC dated one year after the incident. Preston Decl. at Ex. 7 (Oct. 27, 2011 E-mail to EEOC). According to Defendants, DelCastillo was trying to reach into a cabinet over plaintiff and accidentally hit plaintiff. *See* Hr'g Tr., Aug. 9, 2016.

On November 30, 2010, plaintiff had another "Verbal Conference" with Lugo regarding four errors plaintiff had made in October. According to the conference records, plaintiff had one incorrect patient error, one incorrect patient demographic error, and two missed tests. Plaintiff refused to sign the document. Lugo Decl. at Ex. B.

On December 17, 2010, plaintiff had a third "Verbal Conference" with Lugo regarding six errors she made in November. According to records of the conference, plaintiff had one incorrect patient demographic error, one incorrect physician information error, one deletion of requisition error, two missing test errors, and one incorrect comment location error. Plaintiff again refused to sign the document memorializing the conference, instead writing "will do better" on the signature line. Lugo Decl. at Ex. C.

On January 13, 2011, plaintiff had a fourth "Verbal Conference" with Lugo regarding six errors plaintiff made in December. According to records of the conference, plaintiff had one incorrect physician error, two physician missing errors, one incorrect test error, and two missed test errors. Plaintiff again refused to sign, writing "will do better" on the signature line. Lugo Decl. at Ex. D. Plaintiff disputes whether the errors she was accused of making were actually errors or were her fault. *See* Goffe Decl. at ¶¶ 23-24, Ex. 10.

In January 2011, plaintiff had an "Attendance Review" covering the period from September 1, 2010 to December 31, 2010. According to records of the review, plaintiff was late one time, called out sick eight times, and had four 'other' absences. Lugo Decl. at Ex. E.

On January 13, 2011, there was apparently an incident in which plaintiff confronted a co-worker, Charisse Anderson, about a text message that Anderson had sent to another employee in the outpatient laboratory. The confrontation occurred near patients and became loud. Vargas Decl. at Ex. L (Jan. 20, 2011 E-mail from Charisse Anderson), Ex. M (Jan. 14, 2011 E-mail from Theresa Tyler). That evening it was reported that plaintiff became "very upset & hysterical" over the belief that someone had removed a black book from her purse. Plaintiff demanded security be called. The book was located in the lunch room area, plaintiff calmed down and apologized. *Id.* at Ex. N (Jan. 17, 2011 E-mail from Curtis Brown).

On January 18, 2011, plaintiff apparently refused to accept a "Weekly Rotation for Cancer Center Evening Drop Off" schedule when it was being distributed. Plaintiff allegedly told the supervisor who was handing out the sheet to give it to the union delegate, rather than to her. Lugo Decl. at ¶ 23, Ex. F; Goffe Decl. at Ex. 6.

On January 24, 2011, plaintiff was provided a "final warning with a one day suspension for [her] overall work performance and [her] substandard behavior in the workplace." Vargas Decl. at Ex. O. The warning included as its base inappropriate behavior towards a supervisor, looking at a co-worker's cell phone, confronting a co-worker about a personal issue in a patient care area, and refusing to accept a schedule rotation from a direct supervisor. The memorandum also indicated that plaintiff had a total of 34 errors over the third and fourth quarters of 2010. Both plaintiff and her union delegate refused to sign the memorandum. *Id.*

Plaintiff was fired on February 10, 2011. According to the termination memorandum, plaintiff had made six more errors between January 28, 2011 and February 7, 2011. *Id.* at Ex. P. Plaintiff disputes whether they were actually errors or were her fault. *See* Goffe Decl. at ¶¶ 26-28.

Plaintiff filed a grievance through her union and the parties began an arbitration relating to the termination. The parties ultimately settled the arbitration with an agreement that rescinded the termination with no loss of seniority, transferred plaintiff to a different department, and paid her $17,000. Preston Decl. at Ex. 20 (Settlement Agreement). Plaintiff remains employed as a Central Processing Clerk in the Central Processing Unit at NYUHC at no financial loss. Opp'n Mem. at 13.

## C. Alleged Discrimination

In addition to the alleged vandalism of plaintiff's laboratory coat and the incident involving DelCastillo purportedly hitting plaintiff on the head, plaintiff makes several additional complaints about how she was treated.

On June 1, 2010, when plaintiff was reinstated after her first termination, there was a meeting between plaintiff, her union delegate, Cabrera and Vargas. According to a May 1, 2015 letter from the union delegate, discussed was that plaintiff had not been properly trained and that co-workers were speaking Spanish to each other. Preston Decl. at Ex. 5 (May 1, 2015 Letter from Matilde Velez). It is admitted that the union delegate told Cabrera "that this is not the first time she had a conversation with [Cabrera] regarding not training the workers correctly." Compl., July 14, 2014, ECF No. 1-2, at ¶ 19. Plaintiff, who understands some Spanish, felt that the use of Spanish in the workplace created a hostile work environment. Preston Decl. at Ex. 5 (May 1, 2015 Letter from Matilde Velez); 56.1 Response at ¶ 115. Cabrera and Vargas reportedly agreed that plaintiff would receive training and that staff would be told not to speak Spanish. Preston Decl. at Ex. 5 (May 1, 2015 Letter from Matilde Velez). Plaintiff admits that Vargas did send out an e-mail reminding people to speak in English only, except to Spanish-speaking patients. Decl. of Richard L. Steer in Supp. of Defs.' Mot. for Summ. J., Apr. 8, 2016, ECF No. 39 ("Steer Decl."), at Ex. C (Nov. 18, 2015 Dep. Tr. of Niesje Goffe) at 166:18-167:5.

On November 30, 2010, during the "Verbal Conference" plaintiff had with Lugo, she alleges that during the course of the meeting she stepped outside to call her union delegate. While outside, plaintiff claims to have overheard Cabrera (who was also present) refer to her as a "black monkey." Preston Decl. at Ex. 23 (Nov. 18, 2015 Dep. Tr. of Niesje Goffe), at 150:13-151:19. Then, sometime in January 2011, plaintiff alleges that Cabrera referred to her as a "mona negrita," which plaintiff was told means "black monkey" in Spanish. *Id*. at 153:16-154:25. Cabrera denies ever using that term. Steer Decl. at Ex. D (Aug. 4, 2015 Dep. Tr. of Jasmine Cabrera), at 127:12-128:24.

Plaintiff further alleges that:

- she was called stupid and denigrated by her Hispanic supervisors, Preston Decl. at Ex. 23 (Nov. 18, 2015 Dep. Tr. of Niesje Goffe), at 74:6-77:24;

- someone went into her bag and removed an approved vacation request slip, *id*. at 93:16-94:25;

- Lugo called her a Predator because plaintiff's hair reminded Lugo of the alien character from the movie Predator, *id*. at 100:6-103:13; and

- she was denied personal, vacation and sick days even after requests had been approved. Opp'n Mem. at 9.

To support her claims of discrimination, plaintiff provides various forms of documentary support authored by herself and others. First, plaintiff submits a January 15, 2011 e-mail from Marie James, a Senior Secretary at NYUHC, who recounts her knowledge of the treatment plaintiff was purportedly subjected to. *See* Preston Decl. at Ex. 6 (Jan. 15, 2011 Marie James E-mail).

Second, plaintiff points to several anonymous letters submitted through a compliance alert line that report incidents of racial and ethnic discrimination by Defendants. *See id.* at Ex. 8. It is possible that each letter is actually by a single disgruntled employee.

Third, plaintiff submits handwritten pages from what appears to be a diary. Entries are dated in June 2010 and July 2012. The June 2010 entries discuss plaintiff's lack of training and being accused of stealing a training manual. The July 2012 entry discusses an instance in which "Ms L" or "Irena Lut." looked at plaintiff "up and down" and "rolled her eyes at [plaintiff] and gave [her] a dirty look." The entry indicates that plaintiff wrote the individual's name, the date and time down in her book. Plaintiff apparently heard the individual tell someone over the phone later that day about the incident and then laugh at plaintiff. The entry ends with "Lets see her laugh on July 6, 2012 when she see [sic] me in court." Preston Decl. at Ex. 10 (Diary Entries). It is unclear what this court appearance refers to.

### D. EEOC Charge

Plaintiff filed a charge of discrimination with the EEOC. Preston Decl. at Ex. 15 (Feb. 4, 2011 EEOC Notice of Charge of Discrimination). Daniel T. Driesen, associate general counsel at NYUHC, received notice of the charge on or about February 14, 2011. Decl. of Daniel T. Driesen in Supp. of Defs.' Mot. for Summ. J., Apr. 6, 2016, ECF No. 37 ("Driesen Decl."), at ¶ 2. The initial document he received was unsigned. Mr. Driesen did not inform anyone else of the charge until he received the signed charge, dated March 22, 2011. 56.1 Response at ¶ 89. After an investigation, the EEOC concluded that there was credible witness testimony to confirm plaintiff's charge:

> Based on the above, [NYUHC]'s asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that [NYUHC] has discriminated against [plaintiff] on account of her race and color.
>
> The evidence obtained during the investigation was insufficient to establish cause on retaliation allegations because it is unlikely that [NYUHC] received her EEOC Charge before she was terminated.

Preston Decl. at Ex. 21 (Feb. 6, 2014 EEOC Determination Letter).

### E. The Instant Action

Plaintiff filed a complaint in New York Supreme Court on July 14, 2014. The complaint asserts causes of action against NYUHC for discrimination based on disparate treatment, hostile work environment, and retaliation in violation of Title VII, the Civil Rights Act, the New York Human Rights Law, and the New York City Human Rights Law. It also asserts causes of action under the New York City Human Rights Law and Section 1981 against the individual defendants. *See* Summons & Compl., July 14, 2014, ECF No. 1-2.

Defendants removed the action to this court and answered. *See* Notice of Removal, Aug. 21, 2014, ECF No. 1; Answer and Affirmative Defenses, Oct. 8, 2014, ECF No. 14.

## III. Law

### A. Summary Judgment Standard

Summary judgment is appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *Bank of Am., N.A. v. Fischer*, 927 F. Supp. 2d 15, 25 (E.D.N.Y. 2013) (citing *Viola v. Phillips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994)). "The relevant governing law in each case determines which facts are material; '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor." *Id.* (citing *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996)).

Inquiries about discrimination often depend upon the state of a plaintiff's mind, requiring at least some consistent, objective evidence.

> In discrimination cases, the inquiry into whether the plaintiff's sex (or race, etc.) caused the conduct at issue often *requires an assessment of individuals' motivations and state of mind*, matters that call for a "sparing" use of the summary judgment device because of juries' special advantages over judges in this area. Nonetheless, an employment discrimination plaintiff faced with a properly supported summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts. She must come forth with evidence sufficient to allow a reasonable jury to find in her favor. Moreover, *factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment* and that affidavit contradicts her own prior deposition testimony.

*Brown v. Henderson*, 257 F.3d 246, 251-52 (2d Cir. 2001) (internal quotations omitted) (emphasis added).

## B. Title VII and New York State Human Rights Law

### 1. Disparate Treatment

Title VII protects individuals from discriminatory employment practices based on race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e-2(a)(1)-(2). The New York State Human Rights Law similarly protects employees against discrimination based on age, race, creed, color, national origin, sexual orientation, military status, sex, marital status, or disability. N.Y. Exec. L. § 291(1).

"The analytical framework for evaluating a claim of discrimination in violation of Title VII is well established. [The court applies] the three-step burden shifting analysis enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973)." *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996). The same burden shifting approach is applied to discrimination claims under the New York State Human Rights

Law.  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

According to the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is competent to perform the job or is performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances supporting an inference of discrimination based on her membership in the protected class.  *See McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

A plaintiff will only be considered to have been subjected to an adverse employment action if she "endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  For the actions complained of to be materially adverse, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (internal quotation omitted).  "A material adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity."  *Parrish v. Sollecito*, 258 F. Supp. 2d 264, 269 (S.D.N.Y. 2003) (internal quotations omitted).  "[N]ot everything that makes an employee unhappy is an actionable adverse action."  *Sank v. City Univ. of N.Y.*, 219 F. Supp. 2d 497, 503 (S.D.N.Y. 2002) (internal quotation omitted).

Normal scheduling inconveniences, disciplinary notices, threats of disciplinary action and scrutiny of the employee's actions do not constitute adverse employment actions.  *See, e.g.*, *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) (holding that reprimands and threats of disciplinary action did not constitute adverse employment actions).

Once a plaintiff establishes a *prima facie* case of unlawful discrimination, the burden shifts to the defendant to supply a legitimate nondiscriminatory reason for the adverse action. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005).  The burden is "one of production, not persuasion."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  If the defendant meets its burden of production, the *McDonnell Douglas* framework drops out, and the plaintiff must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* at 143 (citation omitted).

### 2. Hostile Work Environment

Hostile work environment claims brought pursuant to Title VII and the New York State Human Rights Law are analyzed under the same standard.  *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 449 (E.D.N.Y. 2013).

For a plaintiff to establish that she was subject to a hostile work environment, it must be shown:

> (1) that the workplace was permeated with discriminatory intimidation that was *sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and* (2) that a specific basis exists for *imputing the conduct that created the hostile environment to the employer*.

*Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004) (emphasis added, internal quotation omitted).  "Generally, the same standards apply to both race-based and sex-based hostile environment claims."  *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 436 n.2 (2d Cir. 1999), *abrogated on other grounds by* 548 U.S. 53 (2006).

"The first element of a hostile work environment claim has both an objective and subjective component: 'the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also [reasonably]

subjectively perceive that [objective] environment to be abusive.'" *Petrosino*, 385 F.3d at 221

(quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

In assessing the atmosphere of the workplace, the court looks at the circumstances in

their entirety. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993). Relevant factors include

"the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance," but "no single factor is required." *Id.* at 23. "Isolated instances

of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570

(2d Cir. 2000), *superseded on other grounds by* N.Y.C. Local L. No. 85. A few isolated

instances of little weight are not enough:

> In order to meet [her] burden [of proving a hostile environment
> claim], the plaintiff must show more than a few isolated incidents
> of racial enmity; *there must be a steady barrage* of opprobrious
> racial comments; evidence solely of sporadic racial slurs does not
> suffice.

*Williams v. Cty. of Westchester*, 171 F.3d 98, 100-01 (2d Cir. 1999) (internal quotations and

citations omitted, emphasis added). The plaintiff must demonstrate either that a single incident

was extraordinarily severe, or that a series of incidents were sufficiently continuous and

concerted to have effectively altered the conditions of her working environment. *See, e.g.*, *Perry

v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997); *Cruz*, 202 F.3d at 571 (concluding that

plaintiff had adduced evidence that she and others were subjected to "blatant racial epithets on a

regular if not constant basis" and that from this evidence "a jury reasonably might conclude that .

. . [the] working environment . . . was hostile to [plaintiff] on the basis of her race").

A plaintiff must show that she was targeted for abusive treatment because of a protected

status. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)

(emphasizing that Title VII prohibits only workplace harassment involving statutorily proscribed forms of discrimination); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").

Favorable or equitable treatment of a protected group as a whole does not preclude a Title VII claim by a member of that group. *Connecticut v. Teal*, 457 U.S. 440, 454-55 (1982) ("Under Title VII, a racially balanced work force cannot immunize an employer from liability for specific acts of discrimination. . . . It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.") (citations omitted).

### 3. Retaliation

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a).

> In the context of a motion for summary judgment, the plaintiff must first demonstrate a *prima facie* case of retaliation, after which the defendant has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained of action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation.

*Richardson,* 180 F.3d at 443. A *prima facie* case of retaliation requires a showing of: "(1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity

and the adverse decision." *Id.*; *see also Sumner v. U.S. Postal Service*, 899 F.2d 203, 208-09 (2d Cir. 1990) (plaintiff must show that "[s]he engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action").

To establish that a plaintiff's activity is protected under Title VII, she "need not prove the merit of [her] underlying discrimination complaint, but only that [she] was acting under a good faith, reasonable belief that a violation existed." *Sumner*, 899 F.2d at 209 (citations omitted). The filing of formal charges of discrimination are protected, as are "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Id.* (citations omitted). There must be a causal connection between the protected activity and the adverse employment action, which can be established indirectly with circumstantial evidence, as by showing that the protected activity "was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." *Id.* (citing *DeCintio v. Westchester Cty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987), and *Grant v. Bethlehem Steel*, 622 F.2d 43, 46 (2d Cir. 1980)).

## C.  42 U.S.C. § 1981

"Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of [Section] 1981 . . . ." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004). The significant differences, for purposes of the instant litigation, are as follows: (1) "while Title VII claims are not cognizable against individuals, individuals may be held liable under section

1981 . . . for certain types of discriminatory acts, including those giving rise to a hostile work environment;" and (2) "although in certain circumstances a Title VII claim may be established through proof of a defendant's mere negligence, without a showing of discriminatory intent, . . . a plaintiff pursuing a claimed violation of section 1981 . . . must show that the discrimination was intentional." *Id.* at 226 (citations omitted); *see also Michaelidis v. Berry*, 502 F. App'x 94, 96 (2d Cir. 2012) ("a § 1981 claim requires proof of an intent to discriminate based on race").

### D. New York City Human Rights Law

The New York City Human Rights Law ("NYCHRL") is somewhat broader than the federal or state statute. It makes it

> an unlawful discriminatory practice . . . [f]or an employer . . . because of the *actual or perceived* age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8-107(1)(a) (emphasis added). The law also prohibits employers from retaliation "because such person has . . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7). The "NYCHRL *additionally proscribes aiding and abetting* discrimination and aiding and abetting retaliation against employees who oppose discriminatory practices." *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 655 (E.D.N.Y. 2015) (citing N.Y.C. Admin. Code § 8-107(6)) (emphasis added).

Before 2005, claims under the NYCHRL were "construed 'to be coextensive with its federal and state counterparts.'" *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 410 (2d Cir. 2015) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 108 (2d Cir. 2013)). In 2005 the NYCHRL was amended through the Local Civil Rights Restoration Act of 2005, which created *two new rules of liberal construction*:

First, it explicitly created a one-way ratchet, by which "[i]nterpretations of New York state or federal statutes with similar wording may be used to aid in interpret[ing]" the NYCHRL, insofar as "similarly worded provisions of federal and state civil rights laws [would constitute] a floor below which the [NYCHRL] cannot fall." Second, *it amended the NYCHRL to require a liberal construction* of its amendments "for the accomplishment of the [NYCHRL's] uniquely broad and remedial purposes . . ., regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of [the NYCHRL], have been so construed."

*Id.* (quoting Local Civil Rights Restoration Act of 2005, Loc. Law No. 85, N.Y.C., N.Y. (2005) ("Restoration Act"), at §§ 1, 7) (emphasis added, internal citation omitted).

The following more liberal principles now guide the evaluation of NYCHRL claims:

> (1) NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims;
>
> (2) the totality of the circumstances must be considered because the overall context in which the challenged conduct occurs cannot be ignored;
>
> (3) the federal severe or pervasive standard of liability no longer applies to NYCHRL claims, and the *severity or pervasiveness of conduct is relevant only to the scope of damages*;
>
> (4) the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives, or if the defendant proves the conduct was nothing more than petty slights or trivial inconveniences;
>
> (5) while courts may still dismiss truly insubstantial cases, even a single comment may be actionable in the proper context; and
>
> (6) summary judgment is still appropriate in NYCHRL cases, *but only* if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory.

*Dillon,* 85 F. Supp. 3d at 654 (first emphasis added) (quoting *Mihalik*, 715 F.3d at 113).

"New York courts seeking to heed the City Council's command have approached discrimination and retaliation claims under a similar framework. In both situations, the plaintiff

must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76 (2d Cir. 2015). "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, . . . or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Id.* at 76 (citations omitted).

## IV. Application of Law to Facts

### A. Statute of Limitations

Defendants contend that "[c]laims related to Plaintiff's May 27, 2010 termination are beyond the statutory period under Title VII, Section 1981, the NYSHRL and the NYCHRL, and are therefore not actionable." Mem. of Law in Supp. of Defs.' Mot. for Summ. J., Apr. 8, 2016, ECF No. 34 ("Defs.' Mem."), at 7 n.6. They argue that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

Although Defendants correctly cite the Supreme Court's first holding in *Morgan*, they ignore the Court's guidance in the opinion's following paragraph: "As we have held, however, this time period for filing a charge is subject to equitable doctrines such as tolling or estoppel." *Morgan*, 536 U.S. at 113.

Here, plaintiff timely filed her charge with the EEOC in February 2011. Until the EEOC issued a right to sue letter, plaintiff could not commence an action in court. *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384-85 (2d Cir. 2015) (explaining that administrative exhaustion is a precondition to a Title VII suit). The EEOC did not issue the right to sue letter until 2014. Preston Decl. at Ex. 21 (Feb. 2, 2014 EEOC Determination Letter). In these circumstances, where plaintiff's delay is entirely attributable to an administrative agency, it

would be unfair to permit the statute of limitations to bar her from complaining about events that occurred in 2010. Applying equitable power it is held that the statute of limitations was tolled while the EEOC conducted its investigation.

## B. Disparate Treatment by NYUHC

### 1. Prima Facie Case

To prevail on summary judgment, plaintiff must sustain her burden through the three-step burden shifting analysis. This process begins with determining whether plaintiff has alleged a *prima facie* case. Defendants gloss over this step in their briefing, focusing instead on the second step of the analysis, while plaintiff moves straight to the third step with arguments about pretext. Even if the parties appear to take the first step for granted, the court will still evaluate plaintiff's claim for a *prima facie* case.

To make out a *prima facie* case, plaintiff must show that (1) she is a member of a protected class; (2) she is competent to perform the job or is performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances supporting an inference of discrimination based on her membership in the protected class. *See McLee*, 109 F.3d at 134.

Plaintiff is a member of a protected class: she is an African American female. There also does not appear to be a dispute about plaintiff's ability to perform her job.

The evidence demonstrates that NYUHC was required to hire plaintiff because she was performing a similar position at another hospital and was assumed to be qualified. Plaintiff is currently working in a similar position in a different department at NYUHC. *See* Opp'n Mem. at 13; Hr'g Tr., Aug. 9, 2016. There is no evidence in the record about plaintiff's performance in this new position. If she is currently performing satisfactorily in a similar position, then it may be reasonable to infer that she was qualified for her prior position.

The third requirement – an adverse action – is met. Plaintiff is relying upon her termination as the adverse action. *See* Hr'g Tr., Aug. 9, 2016. An adverse action generally occurs "when an employee is denied an *economic* benefit." *Hill v. Children's Vill.*, 196 F. Supp. 2d 389, 397 (S.D.N.Y. 2002) (citing *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1176 n.6 (2d Cir. 1996)). Typically, being fired from a job would constitute an adverse action. *Galabya,* 202 F.3d at 640. Courts in the circuit have held that where an employee is rehired and received back pay, economic damages are eliminated and the termination cannot serve as an adverse action. *See Hill*, 196 F. Supp. 2d at 397 (plaintiff rehired one month after termination); *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 139 (E.D.N.Y. 2002) (plaintiff did not suffer an adverse action where he was reinstated with back pay three-weeks after termination); *Lewis v. Boehringer Ingelheim Pharm., Inc.*, 79 F. Supp. 3d 394, 408 (D. Conn. 2015) (no adverse action where plaintiff was fired and re-hired on same day). This authority is distinguishable from the instant case where plaintiff was out of work for more than one year. During this time she had to proceed through an arbitration, and purportedly had to be hospitalized for a nervous breakdown. *See* Hr'g Tr., Aug. 9, 2016. Although plaintiff eventually did receive back pay, being deprived of salary for such a prolonged period of time, as well as the additional injury the situation appears to have caused, is sufficient to constitute an adverse action under the law.

The fourth component of the *prima facie* case – an inference that the adverse action was a result of membership in a protected class – is met. Plaintiff has put forward several bits and pieces of evidence indicating that non-Hispanic employees were treated unfairly and less favorably then Hispanic employees. This treatment includes allegations about the failure to train non-Hispanic employees properly. Because plaintiff's termination was purportedly based on poor performance, and her poor performance was arguably caused by her poor training, it can be

concluded that the adverse action she suffered was a result of Defendants' discriminatory treatment.

### 2. Non-Discriminatory Explanation

Having made out a *prima facie* case using her terminations as an adverse action, the burden shifts to Defendants to proffer a non-discriminatory explanation. Defendants contend that there is ample evidence in the form of test scores and evaluations which justify the decision to fire plaintiff for non-discriminatory reasons. *See* Defs.' Mem. at 7-8, 11-14. Defendants also point to plaintiff's allegedly insubordinate behavior. *See id.* at 12-14.

The evidence shows that plaintiff repeatedly performed poorly on tests, and evaluations documented repeated serious errors. *See* Cabrera Decl at Exs. A-D; Vargas Decl. at Exs. D-E, P; Lugo Decl. at Exs. A-D. Defendants also provide documentation of incidents reflecting inappropriate behavior on the part of plaintiff. *See* Vargas Decl. at Exs. L-O. This evidence is sufficient to meet Defendants' burden of production in providing a non-discriminatory justification for plaintiff's termination. *See Reeves*, 530 U.S. at 142.

### 3. Pretext

Having offered a non-discriminatory reason, plaintiff must submit evidence indicating that Defendants' proffered justification for her termination was pretext. She makes three arguments: first, that not all of the errors attributed to her were actual errors; second, some of the errors she did make were caused by bad information given to her by her supervisors and the lack of training she received; and third, that similarly situated Hispanic employees who made similar errors were not subject to the same discipline that she received. Opp'n Mem. at 21-22.

There is evidence supporting plaintiff's second and third arguments. Defendants admit that plaintiff's union delegate had more than one conversation with Cabrera about not training workers properly. Preston Decl. at Ex. 5 (May 1, 2015 Letter from Matilde Velez); Compl., July

14, 2014, ECF No. 1-2, at ¶ 19.  Plaintiff submitted a declaration in which she claims that neither Cabrera nor any other supervisor sat with her during her first month of employment to train her. Goffe Decl. at ¶¶ 3-4.  She also provides deposition testimony from three people who state that non-Hispanic employees were treated differently when it came to training, and the training such employees received was improper.  *See* Preston Decl. at Ex. 25 (Oct. 22, 2015 Dep. Tr. of Theresa Tyler), at 27:15-30:22, 33:14-34:2, and 38:6-21; *id.* at Ex. 27 (Dec. 8, 2015 Dep. Tr. of Nadila Rigaud), at 14:3-25; *id.* at Ex. 28 (Dec. 8, 2015 Dep. Tr. of Anthony Bibus) at 50:12-54:3.  The EEOC also concluded that Defendants' "asserted defense does not withstand scrutiny" and "there is reasonable cause to believe that [NYUHC] has discriminated against [plaintiff] on account of her race and color."  *Id.* at Ex. 21 (Feb. 6, 2014 EEOC Determination Letter).

With respect to her third argument, plaintiff points to testimony about Guillermo Manrique, a Hispanic employee who made many errors but apparently was never suspended or terminated, as well as testimony that generally describes how Hispanic employees were not disciplined in the same way as non-Hispanic employees.  *See* Preston Decl. at Ex. 24 (Oct. 26, 2015 Dep. Tr. of Peter Vargas), at 177:8-182:6 (discussing Mr. Manrique's disciplinary actions); *id.* at Ex. 25 (Oct. 22, 2015 Dep. Tr. of Theresa Tyler), at 30:23-34:2 (testifying about Mr. Manrique as well as the generally disparate treatment between Hispanic and non-Hispanic employees); *id.* at Ex. 28 (Dec. 8, 2015 Dep. Tr. of Anthony Bibus), at 54:4-55:9 (testifying it was a "joke" how many errors two Hispanic employees made without being disciplined); *id.* at Ex. 29 (Dec. 14, 2015 Dep. Tr. of Anthony Serrano), at 21:23-23:22 (testifying that Hispanic employees would not be disciplined or told about their mistakes while non-Hispanic employees would be).

Defendants respond that Mr. Manrique has a "different disciplinary history" that makes him an unsuitable comparator for plaintiff, but they fail to address the repetitious testimony from multiple individuals who all describe disparate treatment relating to discipline. *See* Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J., June 15, 2016, ECF No. 55, at 17-18. This evidence plaintiff presents is enough to show that Defendants' explanation may be a pretext for discriminatory behavior.

Having satisfied her burden on the final step of the analysis, Defendants' motion on the complaint's first cause of action for disparate treatment pursuant to Title VII and the New York State Human Rights Law is denied.

### C. Hostile Work Environment by NYUHC

To survive summary judgment on a hostile work environment claim, the law sets a high bar. Only actions that are "because of" plaintiff's race or another protected class are considered on summary judgment. *Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303, 2013 WL 1316712, at *12 (E.D.N.Y. Mar. 28, 2013). Plaintiff has submitted sufficient evidence with respect to her training and discipline to survive summary judgment on this claim. At trial, the plaintiff's additional complaints which do not appear to clearly be tied to race may be permitted as evidence of the larger context.

Plaintiff recites her list of complaints in support of her hostile work environment claim. *See* Opp'n Mem. at 28 (listing training, discipline, being hit in the head, denial of request for time off, being called a predator, stupid, and a black monkey). On this motion, the evidence only supports a finding that the lack of training and discipline may have been specifically because of plaintiff's race. *See* Preston Decl. at Ex. 24 (Oct. 26, 2015 Dep. Tr. of Peter Vargas), at 177:8-182:6; *id.* at Ex. 25 (Oct. 22, 2015 Dep. Tr. of Theresa Tyler), at 27:15-34:2, 38:6-21; *id.* at Ex. 27 (Dec. 8, 2015 Dep. Tr. of Nadila Rigaud), at 14:3-25; *id.* at Ex. 28 (Dec. 8, 2015 Dep. Tr. of

Anthony Bibus), at 50:12-55:9; *id.* at Ex. 29 (Dec. 14, 2015 Dep. Tr. of Anthony Serrano), at 21:23-23:22.  There is no evidence that the various one-off comments that were made, the denial of request for time off, or the instance where plaintiff was allegedly hit in the head were because of plaintiff's race.

The lack of training meant that she was unable to perform her job properly, leading to the purportedly disparately-applied discipline.  The evidence indicates that the failure to train and the discipline went on for some time, and occurred to others.  Both the training and discipline impacted all facets of her job.  The evidence also indicates that there was a correlation between training, discipline, and race.

The other actions about which plaintiff complains, however, all appear to be either one-off or sporadic events.  With respect to the disparaging comments plaintiff complains about, she alleges (i) that Cabrera referred to her twice (once to her and once during a conversation with Lugo) as a "black monkey," (ii) that DelCastillo once called plaintiff stupid in a conversation with Cabrera, and (iii) that Lugo once commented how plaintiff's hair reminded her of the movie "Predator."  *See* Preston Decl. at Ex. 23 (Nov. 18, 2015 Dep. Tr. of Niesje Goffe), at 150:13-151:19, 153:16-154:25, 74:6-77:24, 100:2-103:13.  On summary judgment, a handful of comments from different individuals, some of which are not clearly racially motivated, is not sufficient to create a hostile work environment.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.") (internal citations and quotations omitted).  At trial, these comments may be introduced and considered as part of the larger context of plaintiff's work environment.

The incident where DelCastillo allegedly hit plaintiff on the head also occurred only on one occasion. Preston Decl. at Ex. 7 (Oct. 27, 2011 E-mail to EEOC). Plaintiff's conclusion that this action was racially motivated is based entirely on her own assumptions, and is contradicted by her deposition testimony. *See* Defs.' Mem. at 36; Preston Decl. at Ex. 23 (Nov. 18, 2015 Dep. Tr. of Niesje Goffe), at 131:20-24, 133:14-134:3.

Plaintiff also asserts that Hispanic employees spoke in Spanish to each other about her, but does not know this for sure – she only assumes the conversations were about her because the speakers were apparently looking at her. Steer Decl. at Ex. C (Nov. 18, 2015 Dep. Tr. of Niesje Goffe) at 109:3-14. Such speculation is not sufficient to survive a summary judgment motion. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."). Plaintiff's complaint was also responded to by management, which sent out an e-mail to the staff proscribing the use of Spanish. 56.1 Response at ¶ 118; Steer Decl. at Ex. C (Nov. 18, 2015 Dep. Tr. of Niesje Goffe) at 166:18-167:5; *see also* Hr'g Tr., Aug. 9, 2016.

Plaintiff's complaints about her laboratory coat being vandalized and someone taking an approved vacation slip cannot support her hostile work environment claim since there is no evidence that the action was racially motivated. *See Russo,* 972 F. Supp. 2d at 447-48 ("A plaintiff may only recover on a hostile work environment claim if the hostile work environment occurs because of an employee's protected characteristic . . . .") (citing *Rivera v. Rochester Genesee Regional Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012)). Similarly, plaintiff has made no evidentiary showing that she was denied personal, vacation, or sick days as a result of her race.

Defendants submit that, even if plaintiff is able to make out a claim for hostile work environment, summary judgment in favor of NYUHC is still warranted because the alleged offenders were primarily co-workers, rather than supervisors, and because NYUHC took reasonable care to prevent and correct the improper behavior. Defs.' Mem. at 29-30. Defendants also argue that plaintiff's claim is barred because she failed to take advantage of the corrective measures available to her at NYUHC. *Id.* at 30-32.

The Supreme Court has explained that whether a corporate defendant is responsible for harassment perpetrated by its employees depends on whether or not the employees were supervisors and whether a tangible employment action is taken:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). For purposes of this rule, a "supervisor" is someone who "is empowered by the employer 'to take tangible employment actions against the victim, *i.e.,* to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113-14 (2d Cir. 2015) (quoting *Vance*, 133 S. Ct. at 2443). Even if an individual does not have the sole authority to hire or fire an employee, the individual may still be considered to be a supervisor. *See, e.g.*, *Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 187 (S.D.N.Y. 2013) (holding that being able to recommend an adverse employment action may be sufficient to constitute a "supervisor");

*Lolonga-Gedeon v. Child & Family Servs.*, 144 F. Supp. 3d 438, 441 (W.D.N.Y. 2015) (indicating that employee's ability to take disciplinary action against plaintiff after consultation with higher management raised genuine issue of material fact precluding summary judgment; "[t]he Supreme Court made it clear in *Vance* that an individual may qualify as a supervisor even though her decisions are subject to review by higher management"); *but cf. Felmine v. Star*, No. 13-CV-2641, 2016 WL 4005763, at *2 (E.D.N.Y. July 25, 2016) (defendant was not plaintiff's "supervisor" because "[h]e had no authority to hire, fire, evaluate, or discipline employees, or determine [plaintiff's] compensation").

Defendants concede that Vargas is a supervisor. Defs.' Mem. at 28-29. DelCastillo, Lugo, and Cabrera are all designated by title as supervisors and each one appears to have had some ability to discipline and influence plaintiff's working conditions. *See* 56.1 Response at ¶ 9; Preston Decl. at Ex. 5 (May 1, 2015 Letter from Matilde Velez); *id*. at Ex. 22 (Clerical Supervisor Position Description); *id*. at Ex. 24 (Oct. 26, 2015 Dep. Tr. of Peter Vargas), at 21:2-9, 35:7-36:13, 38:3-12. They were each introduced as supervisors at the hearing. *See* Hr'g Tr., Aug. 9, 2016. Whether they had enough authority to qualify as supervisors is a question of fact for the jury. *See Lolonga-Gedeon*, 144 F. Supp. at 441 ("Courts in this Circuit have declined to grant summary judgment after *Vance* where there is evidence that the alleged harasser had the ability to recommend the plaintiffs termination.").

Assuming that the individual defendants do qualify as supervisors, whether plaintiff sufficiently took advantage of the corrective opportunities provided is also a jury question. Plaintiff testified that she did complain to the Employee & Labor Relations Manager several times. Preston Decl. at Ex. 23 (Nov. 18, 2015 Dep. Tr. of Niesje Goffe), at 103:22-104:22, 217:12-218:23. Defendants contend that her complaints were insufficient because plaintiff never

clearly complained that she was being racially discriminated against. Defs.' Mem. at 30-31.

Whether plaintiff's complaints were sufficiently reasonable in the circumstances is a factual

issue that is appropriate for a jury decision.

Defendants' motion for summary judgment on plaintiff's hostile work environment claim

is denied.

### D. Retaliation by NYUHC

Plaintiff's retaliation claim is subject to the same *McDonnell Douglas* shifting framework

that her disparate treatment claim is. To establish her *prima facie* case, plaintiff argues that she

made internal complaints and filed an EEOC charge, and as a result was terminated for a second

time. Opp'n Mem. at 33-34.

Defendants contend that plaintiff cannot show the requisite "but-for" causation between

her complaints and termination. Defs.' Mem. at 33-34. Specifically, Defendants argue that

Vargas, who made the ultimate decision to terminate plaintiff, was unaware of the EEOC

complaint at the time he decided to terminate her. Rather, only NYUHC's associate general

counsel, who had received notice of the unperfected charge, was aware at that time. *Id.* In

support of this argument Defendants submit an affidavit from NYUHC's associate general

counsel. *See* Decl. of Daniel T. Driesen in Supp. of Defs.' Mot for Summ. J., Apr. 6, 2016, ECF

No. 37.

There are three problems with Defendants' argument. First, concluding that the associate

general counsel had not told anyone else about the EEOC charge – which was dated prior to

plaintiff's termination but allegedly received 4 days after her termination – requires making a

credibility determination that is inappropriate on summary judgment. Second, "for purposes of a

prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity

to establish the knowledge prong of the prima facie case." *Kwan v. Andalex Grp. LLC*, 737 F.3d

834, 844 (2d Cir. 2013) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)). Because corporate counsel may have had knowledge of the EEOC charge at the time the decision to terminate her was made, general knowledge can be imputed to NYUHC. Third, plaintiff asserts – with some evidentiary support – that she had made internal complaints before her termination; Defendants would arguably have been aware of these internal complaints. *See, e.g.*, Preston Decl. at Ex. 5 (May 1, 2015 Letter from Matilde Velez); *Id.* at Ex. 6 (Jan. 15, 2011 Marie James E-mail); *Id.* at Ex. 23 (Nov. 18, 2015 Dep. Tr. of Niesje Goffe), at 103:22-104:22, 217:12-218:23; 56.1 Response at ¶ 92.

Defendants make a second argument that "no causal nexus can be established where, as here, Plaintiff's poor performance was recognized and addressed before any complaint of discrimination." Defs.' Mem. at 34. In support of their argument, Defendants point to *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654 (2d Cir. 2009), which explained "the law is clear that '[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" 346 F. App'x at 657 (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)); *see also Inguanzo v. Hous. & Servs., Inc.*, 621 F. App'x 91, 92 (2d Cir. 2015) (summary order) ("causality is lacking when adverse employment actions were both part, and the ultimate product, of an extensive period of progressive discipline [beginning prior to the complaint]") (quotations omitted); *Colvin v. Keen*, No. 13-CV-3595, 2016 WL 233668, at *6 (E.D.N.Y. Jan. 19, 2016) (retaliation could not be shown where record of discipline and errors by plaintiff existed); *Adia v. MTA Long Island R. Co.*, No. 02-CV-6140, 2006 WL 2092482, at *10 (E.D.N.Y. July 26, 2006) (history of deficient work precluded showing of retaliation).

Whether this rule precludes plaintiff's claim turns on disputed facts that must be answered by the jury at trial. Summary judgment is inappropriate on plaintiff's retaliation claim.

### E. New York City Human Rights Law

NYCHRL claims for disparate treatment, hostile work environment, and retaliation require less evidence to survive summary judgment than claims under the state human rights law and federal law. *See, e.g.*, *Adams v. City of N.Y.*, 837 F. Supp. 2d 108, 128 (E.D.N.Y. 2011) ("claims of hostile work environment under the NYCHRL need not establish severe and pervasive conduct to establish liability, so long as the behavior complained of is worse than petty slights and trivial inconveniences.") (quotation omitted). Plaintiff's NYCHRL claims for disparate treatment and hostile work environment survive summary judgment for the same reason and on the same limited ground that her claims under federal and state law survive.

Plaintiff's retaliation claim under the NYCHRL is not subject to the same 'but-for' causation requirement that federal and state law contain: "a plaintiff must still establish that there was a causal connection between her protected activity and the employer's subsequent action . . . ." *Russo*, 972 F. Supp. 2d at 456. There is an issue of fact about who knew of the EEOC charge when plaintiff was terminated. The *Deebs* rule appears to apply to NYCHRL claims in the same way it applies to federal and state law claims. *See Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 534 (S.D.N.Y. 2015) (existence of performance improvement plan precluded retaliation claim under NYCHRL); *Cadet-Legros v. N.Y. Univ. Hosp. Ctr.*, 135 A.D.3d 196, 206-07 (1st Dep't 2015) (termination following record of progressive discipline precluded retaliation claim under NYCHRL); *see also Bacchus v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 214, 247 (E.D.N.Y. 2015) (where employer's action is a continuing course of conduct that began before employee's complaint, causation cannot be established for retaliation claim). Because plaintiff's termination appears to have been the continuation of the progressive discipline she had been

subject to prior to complaining, her retaliation claim under the NYCHRL should also be dismissed.

Individual liability under the NYCHRL only exists if the individual "actually participated in the conduct giving rise to the discrimination claim." *Dillon*, 85 F. Supp. 3d at 658. Under this standard, only the individual defendants who were involved in plaintiff's training and discipline should face liability. The evidence indicates that this category would include Cabrera and Lugo, who were both supervisors in the clerical department, and Vargas who was responsible for the negative evaluations plaintiff received and her ultimate termination. Testimony from third-party witnesses also implicate Cabrera and Lugo in treating non-Hispanic employees differently. Plaintiff has presented sufficient evidence to raise a triable issue of fact on this point. Defendants' motion for summary judgment on the NYCHRL claims against Vargas, Cabrera, and Lugo is denied.

The evidence against DelCastillo is sparse: her alleged behavior appears to be limited to hitting plaintiff on the head once while reaching over plaintiff. There is no evidence that this action was intentionally or unintentionally discriminatory. Nor does it appear that she was involved in the failure to train or disciplining of plaintiff. In the larger context that a jury will be presented with, DelCastillo's behavior may be found to be sufficient. Defendants' motion for summary judgment on the NYCHRL claims against DelCastillo is denied.

Defendants contend that although the NYCHRL is broader than state or federal law, it still requires more than plaintiff's "own conjecture" to survive summary judgment. Defs.' Mem. at 15. They also argue that each of the incidents about which plaintiff complains "is: (a) not motivated by discriminatory animus; (b) the product of Plaintiff's own conjecture and

supposition, unsupported by any record evidence; or (c) insufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment." *Id.* at 18.

As explained above, plaintiff has submitted sufficient evidence to defeat Defendants' opposition. She has offered more than mere speculation, and the failure to train her properly and discipline her in a disparate manner impacted every facet of her job, including causing her to ultimately be fired.

### F. Section 1981 by Individual Defendants

Although Section 1981 claims are analyzed under a similar framework to the one used for Title VII claims, there is a significant difference in that a Section 1981 claim requires a showing of intentional discrimination. *See Patterson*, 375 F.3d at 226.

Plaintiff has not made out a *prima facie* case with respect to any of the individual defendants. The sum of her argument in opposition to the motion is that "it is claimed the Defendants Vargas, Cabrera, Lugo and DelCastillo aided, abetted and were the principle instruments of the discrimination against Ms. Goffe." Opp'n Mem. at 24. Plaintiff does not point to any evidence that plainly shows an intent to discriminate against her. The most supportive evidence in the record only shows disparate treatment in the training and discipline of Hispanic and non-Hispanic employees. *See, e.g.*, Preston Decl. at Ex. 25 (Oct. 22, 2015 Dep. Tr. of Theresa Tyler), at 29:8-30:22; *id.* at Ex. 27 (Dec. 8, 2015 Dep. Tr. of Nadila Rigaud), at 14:3-25; *id.* at Ex. 28 (Dec. 8, 2015 Dep. Tr. of Anthony Bibus), at 50:12-55:9. But this testimony does not show an overt intent to discriminate.

Defendants' motion for summary judgment on the Section 1981 claims against the individual defendants is granted.

## V.  Conclusion

Defendants' motion for summary judgment is denied, except for the Section 1981 claims against the individual defendants. On that claim the motion is granted.

A jury trial shall be held on October 31, 2016 in Courtroom 10 B South. The magistrate judge shall select the jury that morning at a time to be determined by the magistrate.

No later than October 25, 2016, the parties shall exchange and file with the court: (1) pre-hearing briefs; (2) lists of pre-marked exhibits proposed for use at the hearing, together with copies of the exhibits, and any stipulations regarding admissibility and authenticity; (3) lists of proposed witnesses together with brief summaries of their proposed testimony; and (4) stipulations with respect to undisputed facts.

Motions *in limine* shall be filed by October 10, 2016. A hearing on motions *in limine*, if any, shall be held on October 17, 2016, at 10:30 a.m. in Courtroom 10 B South.

The case should be settled. The parties are directed to seek the help of the magistrate judge or court annexed mediation.

SO ØRDERED.

Jack B. Weinstein
Senior United States District Judge

Date:  August 22, 2016
       Brooklyn, New York

38